**COTCHETT, PITRE & MCCARTHY, LLP**
Gia Jung (SBN 340160)
Joseph W. Cotchett (SBN 36324)
Mark C. Molumphy (SBN 168009)
Tyson C. Redenbarger (SBN 294424)
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Tel.: (650) 697-6000
Fax: (650) 697-0577
gjung@cpmlegal.com
jcotchett@cpmlegal.com
mmolumphy@cpmlegal.com
tredenbarger@cpmlegal.com

**BOTTINI & BOTTINI, INC.**
Francis A. Bottini, Jr. (SBN 175783)
Anne B. Beste (SBN 326881)
Albert Y. Chang (SBN 296065)
7817 Ivanhoe Avenue, Suite 102
La Jolla, CA 92037
Tel.: (858) 914-2001
Fax: (858) 914-2002
fbottini@bottinilaw.com
abeste@bottinilaw.com
achang@bottinilaw.com

*Counsel for Plaintiff Rudy K. Thompson*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| **Rudy K. Thompson**, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>**23ANDME, INC.**, a Delaware corporation,<br><br>Defendants. | Case No. _____<br><br>**CLASS ACTION COMPLAINT FOR:**<br><br>**(1)  Violations of the Comprehensive Computer Data Access and Fraud Act CAL. PENAL CODE § 502**<br><br>**(2)  Negligence;**<br><br>**(3)  Negligence per se;**<br><br>**(4)  Breach of contract**<br><br>**(5)  Breach of Implied Covenant of Good Faith and Fair Dealing;** |

**(6)**    **Breach of fiduciary duty**

**(7)**    **Violations of the California Customer Records Act, CAL. CIV. CODE §§ 1798.80, et seq.**

**(8)**    **Violation of Cal. Bus. & Prof. Code § 17200, et seq.;**

**(9)**    **Invasion of Privacy Violation of California Common Law and the California Constitution, Art. 1, § 1;**

**(10)**   **Unjust Enrichment;**

**(11)**   **Declaratory and Injunctive Relief;**

**(12)**   **Deceit by Concealment, CAL. CIV. CODE § 1710(3)**

**(13)**   **Violations of California Consumers Legal Remedies Act, CAL. CIV. CODE § 1750, et seq.**

**(14)**   **Violation of 410 ILCS 513, et seq.; Alaska Stat. § 18.13.010, et seq.; Or. Rev. Stat. § 192.531, et seq.**

**<u>DEMAND FOR JURY TRIAL</u>**

**Table of Contents**

1
2                                                                                                    **Page**
3
4   **INTRODUCTION**.................................................................................................................. 1
5   **PARTIES** ............................................................................................................................ 5
6   **JURISDICTION AND VENUE** ...................................................................................... 5
7   **DIVISIONAL ASSIGNMENT** ........................................................................................ 5
8
9   **STATEMENT OF FACTS** ................................................................................................. 6
10      I.    Company Background of 23&Me ............................................................... 6
11      II.   23&Me Data Practices................................................................................. 7
12      III.  23andMe Discloses Some Customers Had Been Hacked ........................... 8
13      IV.   The Reality of the Breach was Worse Than 23andMe Disclosed ............... 9
14      V.    23andMe's Post-Investigation Notices Reveal Greater Harm ................. 11
15      VI.   Despite 23andMe's Disregard, Customers Were Harmed by the Breach .............................. 14
16      VII.  23andMe Failed to Implement Basic Security and Threat Detection Measures ................... 17
17   **CLASS ACTION ALLEGATIONS** ................................................................................ 21
18   **CAUSES OF ACTION** ..................................................................................................... 23
19
20   COUNT I
    Violations of the Comprehensive Computer Data Access and Fraud Act Cal.
21   Penal Code § 502 ............................................................................................................ 23
22   COUNT II
    Negligence ....................................................................................................................... 26
23
24   COUNT III
    Negligence *Per Se* .......................................................................................................... 27
25
26   COUNT IV
    Breach of Contract .......................................................................................................... 28
27   COUNT VI
    Breach of Implied Contract............................................................................................. 30
28

COUNT V
Breach of Implied Covenant of Good Faith and Fair Dealing............................................. 31

COUNT VI
Breach of Fiduciary Duty..................................................................................................... 32

COUNT VII
Violations of the California Customer Records Act CAL. CIV. CODE §§ 1798.80, *et Seq*............... 33

COUNT VIII
Violations of the California Unfair Competition Law
CAL. BUS. & PROF. CODE §§ 17200, *et Seq*. .................................................................... 34

COUNT IX
Invasion of Privacy Violation of California Common Law and the California Constitution,
Art. 1, § 1 ........................................................................................................................... 36

COUNT X
Unjust Enrichment ............................................................................................................... 38

COUNT XI
Declaratory and Injunctive Relief ....................................................................................... 38

COUNT XII
Deceit By Concealment, CAL. CIV. CODE § 1710(3) ........................................................ 40

COUNT XIII
Violations of California Consumers Legal Remedies Act  CAL. CIV. CODE § 1750, *et Seq*............. 41

COUNT XIV
Violation of the Illinois, Alaska, and Oregon Privacy Statutes
(On Behalf of Plaintiff and the State Genetic Privacy Statute Subclass) ............................ 42

**PRAYER FOR RELIEF**............................................................................................................ **44**

**JURY TRIAL DEMAND** ........................................................................................................... **44**

Plaintiff Rudy K. Thompson, on behalf of himself and all others similarly situated, brings this class action complaint against Defendant 23andMe, Inc. ("23andMe").  Plaintiff alleges the following (a) upon personal knowledge with respect to the matters pertaining to themselves; and (b) upon information and belief with respect to all other matters, based upon, among other things, the investigations undertaken by Plaintiff's counsel. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth below after a reasonable opportunity for discovery.

## INTRODUCTION

1. This is a class action lawsuit seeking damages and declaratory and injunctive relief on behalf of Plaintiff and other customers of Defendant 23andme, Inc. who have been harmed by data breaches at the Company.

2. Defendant 23andme, Inc. is a corporation with its principal executive offices located at 349 Oyster Point Boulevard, South San Francisco, California 94080, in San Mateo County.  The Company's Class A common stock trades on the NASDAQ stock exchange under the symbol "ME."

3. The Company is best known for providing a direct-to-consumer genetic testing service in which customers provide a saliva sample that is laboratory analyzed, using single nucleotide polymorphism genotyping, to generate reports relating to the customer's ancestry and genetic predispositions to health-related topics.

4. As more specifically described below, this case is brought on behalf of all persons in the United States who have been adversely affected by the data breaches originally announced by 23andme, Inc. on October 11, 2023 and then supplemented on December 1, 2023, including all persons who were sent notice by Defendant that their personal information was compromised as a result of the data breach (the "Class").

5. When the Company first announced the data breaches in October 2023, it failed to disclose the material fact that hackers who infiltrated 23andMe's system were after the personal information of Jewish and Chinese customers. The Company made a second disclosure about the data breaches on  December 1, 2023 that contained additional  information regarding harm to Class members.  The notice, filed with the SEC via a Form 8-K, stated:

***The information accessed by the threat actor in the Credential Stuffed Accounts*** varied by user account, and generally ***included ancestry information, and, for a subset of those accounts, health-related information based upon the user's genetics***. Using this access to the Credential Stuffed Accounts, the threat actor also accessed a significant number of files containing profile information about other users' ancestry that such users chose to share when opting in to 23andMe's DNA Relatives feature ***and posted certain information online***.[1]

6. In addition, it was not disclosed until recently that the hackers had obtained access to one of the Company's features called "DNA Relatives." When customers use this feature, select information is shared with other 23andMe customers who might be a close genetic match. By gaining access to this feature, the hackers obtained information from 5.5 million DNA Relatives profiles. Such profiles may include a customer's geographic location, birth year, family tree and uploaded photos.

7. The hackers were also able to access the profile information of an additional 1.4 million customers by accessing a feature called Family Tree.

8. The Company's initial notification to consumers of the data breach in October 2023 failed to disclose many material facts, including the misappropriation of the DNA Relatives information and the fact that customers' private genetic information had been posted or leaked to the dark web, along with other sensitive personal information, including but not limited to their names, home addresses, genetic heritage, dates of birth, and profile pictures.

9. Defendant did not notify the California Attorney General of the data breach until on or about January 21, 2024. The Company represented to the California Attorney General's office that data breaches occurred on Saturday, April 29, 2023 and Wednesday, September 27, 2023.[2]

10. The Company's December 1, 2023 disclosure also continued to conceal the fact that the hackers specifically targeted the personal genetic information of Jewish and Chinese customers and compiled that data - including genetic heritage, names, and addresses - into lists that were then sold on the dark web. Hackers compiled a giant list of people with Ashkenazi Jewish ancestry and posted the

---

[1] Available at https://www.sec.gov/ixviewer/ix.html?doc=/Archives/edgar/data/0001804591/000119312523287449/d242666d8ka.htm , last visited Feb. 13, 2024.

[2] Available at https://oag.ca.gov/ecrime/databreach/reports/sb24-579679, last visited Mar. 1, 2024.

information on the dark web, including a list of 999,999 23andme customers. It includes their first and last name, sex, and 23andMe's evaluation of where their ancestors came from. The database is titled "ashkenazi DNA Data of Celebrities," although most of the people on it are not famous.  NBC News reported that it was able to verify that at least two of the persons in the database were 23andme customers.[3]

11.     These breaches and the specific targeting of persons of Jewish and Chinese descent has raised the distinct possibility that such customers and Class members could become targets of antisemitic hate speech.   Violence and hate speech have surged lately, fueled by the ongoing conflict between Israel and Gaza.

12.     The hackers and/or those working in concert with them have also supposedly leaked a list of 350,000 Chinese customers to a user with the alias "Wuhan."

13.     The data breach has threatened the personal safety and security of customers like Plaintiff and risks subjecting them to ethnic targeting, discrimination, and harassment.

14.     Defendant has yet to provide a full and complete disclosure to Plaintiff and other class members of Jewish and Chinese descent.  Plaintiff seeks declaratory and injunctive relief, including full disclosure, to protect such persons from imminent harm.

15.     Further, while it was concealing material aspects of the data breach, Defendant moved to try to undermine the rights of Plaintiff and the Class to protect themselves through data privacy class action lawsuits like the present case.  Defendant purported to post a notice to its website in December 2023 stating that customers who did not "opt out" within 30 days would be precluded from bringing class action claims.  The notice was not personally delivered to customers, was not conspicuous and widely disseminated, and represented a bad-faith attempt to undermine class members' claims before they even knew the full extent of the data breach.

16.     Plaintiff has opted out of Defendant's "after the fact" attempt to deprive Plaintiff of his right to bring this action as a class action.

---

[3] *See* Kevin Collier, "23andMe User Data Targeting Ashkenazi Jews Leaked Online," NBC News, Oct. 7, 2023.

17.     As set forth more fully below, 23andme, Inc. breached its contractual and statutory obligations to Plaintiff and the Class.  The Company promised to safeguard Plaintiff's sensitive, non-public genetic and DNA information yet failed to do so.  Defendant's Privacy Policy stated that:

"Your privacy comes first.  When you explore your DNA with 23andMe, you entrust us with important personal information. That's why, since day one, protecting your privacy has been our number one priority. We're committed to providing you with a safe place where you can learn about your DNA knowing your privacy is protected."

18.     The specific protections that 23andme represented to Plaintiff that it had adopted and implemented, and that it agreed to utilize as part of providing services to Plaintiff, included its representation that:

- We will not share your genetic data with employers, insurance companies, public databases or 3rd party marketers without your explicit consent.
- We give you full control to decide how your information is used and with whom it is shared.
- We break everything down into easy-to-understand language so that each choice you make is an informed choice.
- We exceed industry data protection standards and have achieved 3 different ISO certifications to demonstrate the strength of our security program.
- We encrypt all sensitive information and conduct regular assessments to identify security vulnerabilities and threats.
- We will not release any individual-level personal information to law enforcement unless we are required to do so by court order, subpoena, search warrant or other requests that we determine are legally valid.

19.     Defendant has breached these promises and warranties by failing to maintain its computer systems in a safe manner so as to prevent data breaches, hacks, and misappropriation of consumers' highly sensitive personal information.

20.     Plaintiff bring this class action on behalf of himself and the Class, including a subclass of all persons of Jewish and Chinese descent threatened with harm from the data breach, for damage and injunctive/equitable relief against Defendant 23andMe.

## PARTIES

21.     Plaintiff Rudy K. Thompson is a natural person and is a customer of Defendant 23andMe, Inc.  During the relevant period, Plaintiff purchased services from 23andMe, Inc. and was a customer of the Company.  Plaintiff opted out of Defendant's December 2023 attempt to deprive Plaintiff of his right to bring this action as a class action, thus preserving his right to do so.

22.     Defendant 23andMe, Inc., is a Delaware corporation with its principal place of business located at 349 Oyster Point Boulevard, South San Francisco, California 94080.

## JURISDICTION AND VENUE

23.     This Court has original jurisdiction over this action under 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds the sum or value of $5 million, exclusive of interests and costs, there are more than 100 members of the proposed Classes, and at least one Class Member is a citizen of a state different from Defendant.

24.     This Court has personal jurisdiction over Defendant because Defendant is headquartered in California, its principal place of business is in California, and it regularly conducts business in California.

25.     Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendant and/or its parents or affiliates are headquartered in this District and a substantial part of the events or omissions giving rise to Plaintiff' claims occurred in this District.

## DIVISIONAL ASSIGNMENT

26.     Pursuant to Civil Local Rule 3-2(c)&(d), this case should be assigned to the San Francisco Division because a substantial part of the events or omissions giving rise to the claim occurred within the county of San Francisco.

**STATEMENT OF FACTS**

**I.      Company Background of 23&Me**

26.      23andMe, founded in 2006, is best known as a genetic testing company that provides customers with personalized insights into their ancestry and related health risks. According to its website, 23andMe's "mission is to help people access, understand, and benefit from the human genome." It seeks to "disrupt the healthcare experience by building a personalized health and wellness experience that caters uniquely to the individual by harnessing the power of their DNA."

27.      To access these services, customers must purchase a package from the company's website which range between $119 to $298. They then receive a kit to collect their saliva and send the sample to the company's lab.  23andMe is then in possession of customers' personal genetic material as well as additional private information like customer addresses, birth dates, and names. Finally, 23andMe processes the sample and sends customers a report with "insights on [] health predispositions, carrier status, traits, wellness and ancestry."

28.      The reports are incredibly detailed and can include insights into users' predisposition and carrier status for certain cancers, diabetes, hearing and vision loss, celiac disease, Alzheimer's disease, and cardiovascular diseases, amongst others. 23andMe also offers a "Powered by 23andME Research" report which is based on a statistic model and considers the user's sex and ethnicity to provide likelihoods of developing certain conditions.

29.      23andMe also provides an interactive platform that allows users to find their "DNA Relatives." This feature allows "connect with genetic relatives and learn more about [their] family." Users are prompted to opt-in to this service twice: first when they register their kits and again when they first visit the feature online. Customers that opt-in are able to see other customers' display name, how recently they logged in to their accounts, relationship labels, predicated relationship and percentage of DNA shared with matches, location, ancestor birth locations and family name, ancestry reports, maternal and paternal haplogroup results and neanderthal ancestry results, profile pictures, birth years, links to "Family Trees" and anything users have added to their introductions.

## II.  23&Me Data Practices

30.  With more than 14.1 million users[4] and over 10 million who have consented to sharing their genetic information for search,[5] 23andMe is more than just a genetic testing company: it is also a data company.

31.  23andMe promises users that "privacy comes first," that protecting users' privacy has been its "number one priority," and reassures users that they "are free to explore [their] DNA with confidence." 23andMe tells customers that their "data is fiercely protected by security practices that are regularly reviewed and updated." Further, the company provides that customers can be "[r]est assured knowing that" they "give [users] full control to decide how [their] information is used and with whom it is shared" and that they "encrypt all sensitive information and conduct regular assessments to identify security vulnerabilities and threats."

32.  To do this, the company provides that it uses the "highest industry standards for data security" since "its information security management system received certification under globally recognized ISO/IEC 27001:2013, 27018 & 27701 standards after an extensive security audit." Its privacy policy again assures customers that the company has implemented "physical, technical, and administrative measures aimed at preventing unauthorized access to or disclosure of your Personal Information."

33.  The 23andMe privacy page features a FAQ portion. One question asks, "What do you do to stay ahead of hackers?" The company's answer states:

> We take multiple steps. First of all, third-party security experts regularly conduct audits and assessments of our systems, ensuring we will never let our guard down. We encrypt all sensitive information, both when it is stored and when it is being transmitted, so that we make it difficult for potential hackers to gain access.

Another question asks, "Anything else you can tell me to put my mind at ease?" The company's answer states:

> Rest assured that your personally identifiable information (such as your name and email) is stored in [] a separate database from your genetic data so that no one but you (when you use your username and password) can connect the dots between the two. That means even if

---

[4] FY 2022 10-K at 69.

[5] Emily Mullin, "23andMe Is Under Fire. Its Founder Remains 'Optimistic'" WIRED (Feb. 12, 2024) https://www.wired.com/story/23andme-genomic-testing-financial-results-earnings-anne-wojcicki/

someone gained access to one of these databases, they could not connect your identity to your genetic data, or vice versa.

Plaintiff and the Proposed Class Members reasonably relied on 23andMe to keep their personal information secure.  23andMe owed a duty to Plaintiff and the Proposed Class Members to secure their personal information and ultimately breached that duty.

### III.    23andMe Discloses Some Customers Had Been Hacked

34.    On October 6, 2023, 23andMe disclosed that it had "recently learned" that a release of "customer profile information," shared through the company's DNA Relatives feature, had occurred without the account users' authorization.  23andMe noted that it began an investigation immediately after learning of the suspicious activity, which was ongoing.  The blog post and emailed statement issued by 23andMe further noted that the company believed that "threat actors were able to access certain accounts in instances where users recycled login credentials,"[6] a practice known as "credential stuffing."  23andMe recommended users confirm they have a strong password and encouraged them to enable multi-factor authentication.

35.    On October 9, 2023, 23andMe updated their blog with additional information on "What actions has 23andMe taken" noting the engagement of third-party forensic experts and federal law enforcement officials.  23andMe further required all customers reset their passwords and again encouraged (but did not require) the use of multi-factor authentication.

36.    On October 10, 2023, 23andMe filed Form 8-K with the Securities and Exchange Commission regarding the data breach.[7]  The disclosure was short and did not provide details of the breach.  23andMe wrote that "certain profile information" was accessed, and that "certain accounts" were accessed through credential stuffing.  23andMe noted that it "undertook immediate action in accordance with its incident response plan, including taking affirmative security measures to mitigate any potential impact of the incident, working to validate whether data that was accessed was legitimate data from the Website, and determining the full scope of data accessed by unauthorized individuals."

---

[6] Available at https://blog.23andme.com/articles/addressing-data-security-concerns, last visited Mar. 1, 2024

[7] Available at https://investors.23andme.com/sec-filings/sec-filing/8-k/0001193125-23-253488, last visited Mar. 1, 2024

The disclosure underscored that 23andMe's investigation was ongoing, and the 23andMe was working to confirm the scope of data accessed, the nature of the personal data in question, and any related legal obligations.

37.    On October 20, 2023, another update noted the temporary disabling of some features within the DNA Relatives tool. In the last update before it's announcement in December that it had completed its investigation, on November 6, 2023, 23andMe started requiring that all customers utilize 2-step verification.

38.    This was all too little, too late.  Defendant's initial blog posts and SEC filing failed to provide basic details concerning the Data Breach, including but not limited to how unauthorized third parties were able to access Private Information, that the hackers had specifically targeted customers of Jewish and Chinese descent, what Private Information was in fact compromised, and how many people were affected by the Data Breach.  Reasonable steps to remedy the situation were slow, or non-existent.

**IV.    The Reality of the Breach was Worse Than 23andMe Disclosed**

39.    In reality, the stolen data had already been circulating for months before 23andMe's initial October disclosure to its users.  And, while 23andMe did not provide information on how many users were affected, hackers began selling data that appeared to be misappropriated from millions of users.

40.    On August 11, a hacker on a known cybercrime forum called Hydra advertised a set of 23andMe user data.  The hacker claimed to have 300 terabytes of stolen 23andMe user data, and said in a post that it contacted 23andMe, "but instead of taking the matter seriously, they asked irrelevant questions." The hacker asked for $50 million for the data, and claimed it would only sell it once, but also offered to sell only a subset of data for between $1,000 and $10,000.  On the same day as the Hydra forum post, a Reddit user added a note on the 23andMe unofficial site subreddit, alerting other users of the alleged breach.  Reddit is a public forum, not part of the dark web, but 23andMe either failed to monitor normal channels or chose not to act in response to the Hydra and Reddit posts.

41.    On October 1, 2023, a hacker with the username "Golem" claimed to have stolen the DNA information in a post on the well-known hacking platform BreachForums.  As proof, the hacker published the alleged data of one million users of Jewish Ashkenazi descent and 100,000 Chinese users,

asking would-be buyers for $1 to $10 for the data per individual account. Golem's post advertised genomic ancestry data for the users of Ashkenazi descent as "the most valuable data you'll ever see" and noted while one million was available in the posted link, "there is close to 20 million pieces of data available" and that raw data for the accounts would be available for $5 each. The data included 23andMe DNA and profile data, including full names, home addresses, birth dates, and ancestry.

42.     That same day, another account on BreachForums with the username "Wuhan" replied to Golem's post to ask if he had "Chinese accounts" and to speak privately. Golem provided a link to the DNA and profile data of 100,000 Chinese 23andMe customers, and stated that he had 350,000 records of Chinese 23andMe customers, which he would release if there was interest.

43.     The next day, October 2, 2023, Golem leaked another link to the stolen data of "half of the members of 23andMe," advertising that the data included their "origin estimation, phenotype and health information, photos and identification data, raw data, and their last login date." Half the records of 23andMe's reported users would be seven million accounts.

44.     On October 3, 2023, Golem posted an additional advertisement including pricing for "[t]ailored ethnic groupings, individualized data sets, pinpointed origin estimations, haplogroup details, phenotype information, photographs, links to hundreds of potential relatives, and most crucially raw data profiles."

45.     On analysis, the August data and the October data both included some records that matched. The two sets of information were formatted differently but contained some of the same unique user and generic data, suggesting the data leaked by the hacker in August was at least in part authentic 23andMe customer data. On October 17, 2023, Golem published a new dataset of four million 23andMe user records, claiming that the dataset contained information on people who come from Great Britain, including data from "the wealthiest people living in the U.S. and Western Europe"[8] and "all wealthy families serving Zionism" that he was offering for sale in the aftermath of the deadly explosion at Al-Ahli Arab Hospital in Gaza City. Golem continued to post and respond to posts expressing

---

[8] Lorenzo Franceschi-Bicchierai, "Hacker leaks millions more 23andMe user records on cybercrime forum" TechCrunch (Oct. 18, 2023) https://techcrunch.com/2023/10/18/hacker-leaks-millions-more-23andme-user-records-on-cybercrime-forum/?mrfhud=true

1   interest with similar antisemitic rhetoric.

2   46.     A researcher examining the leaked database found that much of it looked real. The

3   researcher spoke on condition of anonymity because he found the information of his wife and several of

4   her family members in the leaked data set. He also found other acquaintances and verified that their

5   information was accurate.[9]  The researcher downloaded two files from the BreachForums post and

6   found that one had information on 1 million 23andMe users of Ashkenazi heritage. The other file

7   included data on more than 300,000 users of Chinese heritage.  The data included profile and account

8   ID numbers, names, gender, birth year, maternal and paternal genetic markers, ancestral heritage

9   results, and data on whether or not each user has opted into 23andme's health data.  Other reports have

10  indicated that additional details contained in the hacked information could include geographic location,

11  mitochondrial DNA haplogroup, Y-chromosome DNA haplogroup, links to external family trees, and

12  any text descriptions that customers had optionally included in their "About" section on 23andme's

13  website.

14  **V.     23andMe's Post-Investigation Notices Reveal Greater Harm**

15  47.     On December 1, 2023, 23andMe filed an Amendment to its October 10 SEC Form 8-K

16  filing.  The amendment identified the October 1, 2023 posting as the incident that prompted 23andMe's

17  investigation and incident response.  The amendment flagged that "[b]ased on its investigation,

18  23andMe has determined that the threat actor was able to access a very small percentage (0.1%) of user

19  accounts," or around 14,000.  The information accessed by the hackers for those accounts "varied by

20  user account, and generally included ancestry information, and, for a subset of those accounts, health-

21  related information based upon the user's genetics."  23andMe also noted that the threat actor also

22  accessed a significant number of files containing profile information about other users' ancestry" but

23  did not disclose a number.

24  48.     Yet the next day, in an email sent to TechCrunch late on Saturday, December 2,

25  23andMe spokesperson Katie Watson confirmed that hackers accessed the personal information of 6.9

26

27  _____

  [9] Jonathan Greig, "23andMe scraping incident leaked data on 1.3 million users of Ashkenazi and
28  Chinese descent" The Record (Oct. 6, 2023) https://therecord.media/scraping-incident-genetic-testing-
   site

million individuals.  This included about 5.5 million people who opted-in to 23andMe's DNA Relatives feature, which allows customers to automatically share some of their data with others.[10] The stolen data included the person's name, birth year, relationship labels, the percentage of DNA shared with relatives, ancestry reports and self-reported location.  That number also includd=ed another group of about 1.4 million people who opted-in to DNA Relatives also "had their Family Tree profile information accessed," which includes display names, relationship labels, birth year, self-reported location and whether the user decided to share their information, the spokesperson said.

49.     On December 5, 2023, 23andMe announced on its blog and to affected users that the data breach may have affected as many as 6.9 million individual 23andMe customers. The Company stated that a threat actor engaged in "credential stuffing" by re-using usernames and passwords that previously had been compromised or were otherwise available to access 14,000 individual customer accounts, which included their name, sex, date of birth, geographical location, and genetic ancestry results. Through these compromised accounts, the threat actor accessed personal information ("PI") from an additional 5.5 million individuals who used 23andMe's "DNA Relatives" feature, including each individual's name, birth year, relationship labels, the percentage of DNA shared with relatives, ancestry reports, and self-reported location, and another 1.4 million people who used the Family Tree feature that displays a subset of the information available in the DNA Relatives feature.

50.     As described above, 23andMe purportedly reacted to the October 1, 2023 post advertising the stolen data, which was "widely reported,"[11] even though reporters and customers found that the data was being advertised and sold in August.  In its latest disclosure to the California Attorney General however, 23andMe revealed that hackers started breaking into customers' accounts in April 2023, and continued through most of September.  Indeed, the data breach described in the California disclosure is much worse than originally reported or described.

51.     On January 21, 2024, 23andMe submitted to the California Attorney General a sample copy of its breach notice to California residents as required by California law.  That submission

---

[10] Lorenzo Franceschi-Bicchierai, "23andMe confirms hackers stole ancestry data on 6.9 million users" TechCrunch (Dec. 04, 2023) https://techcrunch.com/2023/12/04/23andme-confirms-hackers-stole-ancestry-data-on-6-9-million-users/

[11] *Id.*

identifies the dates of breach as Saturday, April 29, 2023 and Wednesday, September 27, 2023.[12]  The body of the notice said that 23andMe "believe[s] a threat actor orchestrated a credential stuffing attack during the period from May 2023 through September 2023."  Yet the Company's notice still identifies October 1, 2023 as the operative incident date that triggered 23andMe's investigation.  The notice also goes on to provide some information about the October Golem posts, describing how the hacker posted on BreachForums and included links to DNA Relatives profile information, "which may have included your DNA Relatives profile information."  This information includes the customer's name, birth year, relationship labels, the percentage of DNA shared with relatives, ancestry reports and self-reported location. This updated notice, although the most comprehensive notice by 23andMe thus far, is still woefully deficient.  It fails to mention the August posting of the same information, despite that being public information, thus depriving its customers knowledge about the full scope and severity of the breach.

52.     Shockingly, the Company's notice letter describes that hackers were able to access, through the credential-stuffing, users' "uninterrupted raw genotype data" and other highly sensitive information, like health predisposition reports and carrier-status reports.  This information is, essentially, health care information—the reports describe a user's probability, based on their genetics, of contracting certain health conditions like cancer or dementia.

53.     Under the heading "What we are doing" 23andMe illustrates its paltry response while still claiming to continue its investigation.

> When 23andMe became aware of the incident, we immediately began working with third-party security experts to investigate the incident, and we contacted federal law enforcement. On October 10, we required all 23andMe customers to reset their password. On November 6, we required all new and existing customers to login using two-step verification. While we continue our investigation, we have also temporarily paused certain functionality within the 23andMe platform. We are also taking steps to have the re-posted  DNAR Profile File removed from other websites.

54.     At the end of its updated notice, 23andMe concludes with an apology for "any inconvenience caused to you by this incident."  But in many ways, this data breach was more than just an "inconvenience" to 23andMe customers.  It allowed threat actors access to extremely personal and

---

[12] Available at https://oag.ca.gov/ecrime/databreach/reports/sb24-579679, last visited Mar. 1, 2024

1  sensitive information that, unlike credit card information, email addresses, or passwords, are

2  unchangeable.

3  **VI.    Despite 23andMe's Disregard, Customers Were Harmed by the Breach**

4      55.    Indeed, 23andMe has wholly disregarded the harm that it allowed its customers to be

5  exposed to.  In a December 11, 2023 letter to attorneys representing certain 23andMe customers,

6  23andMe's attorney, Ian Ballon stated that "the information that was potentially accessed cannot be

7  used for any harm."[13] But as Angela Downing, cofounder of The Light Collective, which advocates for

8  responsible medical data stewardship noted, "[t]here are a whole range of harms that can follow a

9  person far beyond financial impacts when we talk about targeting people based on their health

10 vulnerabilities…People can be targeted based on their health vulnerabilities and become easy fodder for

11 medical fraud." The medical information of nearly 10 million people would be an invaluable resource

12 to drug marketers, insurance companies, and manufacturers of bogus medical devices.[14]  There is no

13 way to change this information—but 23andMe has not offered any monitoring service for use of this

14 data to its customers, nor acknowledges its potential for misuse.

15     56.    Customers' ancestry information also cannot be changed and is already being sought

16 out and allegedly used by hackers to target Class Members as retaliation for Israel's response to Hamas'

17 October 7, 2023 massacre of Israel citizens.  For example, On Oct. 17, 2023 the hacker Golem returned

18 to an Internet forum to say he had data about "wealthy families serving Zionism" that he was offering

19 for sale in the aftermath of the deadly explosion at Al-Ahli Arab Hospital in Gaza City.[15]

20     57.    Further, the fact that 23andMe claims the "information that was potentially accessed

21 cannot be used for any harm," is considered foolhardy by many security experts. 23andMe has

22 dismissed the potential harm of the data breach based on the absence of traditional sensitive

23 information, including credit card details, driver's license numbers, and social security numbers.  The

24 issue with this is that relation and genealogy information has been exposed, which can potentially be

25

26 _____

[13] Letter from Ian C. Ballon, Attorney for 23andMe, to Hassan A. Zavareei (Dec. 11, 2023)
https://www.documentcloud.org/documents/24252535-response-letter-to-tycko-zavareei-llp

27 [14] Steven Levy, "Your Medical Data Is Code Blue" WIRED (Jan. 12, 2024)
https://www.wired.com/story/plaintext-our-medical-security-is-code-blue/

28 [15] *See, e.g.*, Rebecca Carballo, "23andMe Breach Targeted Jewish and Chinese Customers, Lawsuit
Says," THE NEW YORK TIMES (Jan. 26, 2024)

very useful for attackers aiming to make a targeted social engineering attack. Such attacks could scam consumers, steal identities, and help them gain access within corporate infrastructures.

58.     In October, when the breach was ongoing, a researcher noted "23andme seems to think this isn't a big deal. They keep telling me that if I don't want this info to be shared, I should not opt into the DNA relatives feature. The Company's indifferent dismissal of these serious concerns ignores  the importance of this data which should only be viewable to DNA relatives, not the public. And the fact that someone was able to scrape this data from 1.3 million users is concerning. The hacker allegedly has more data that they have not released yet."[16]  The researcher added that he discovered another issue where someone could enter a 23andme profile ID, like the ones included in the leaked data set, into their URL and see someone's profile.

59.     23andMe's website was flawed in its website and design to the extent that it was possible to freely access customer information just by typing a profile ID into the URL.  Despite 23andMe's claims that its customers "negligently" failed to update their passwords, while users have an obligation to follow security practices to keep their information safe, companies also have a responsibility to protect their customer's sensitive data. 23andMe customers entrusted the company with that information, much of which was necessary to access the service. The breach impacted millions of consumers whose data was exposed through the DNA Relatives feature on 23andMe's platform, not because they used recycled passwords. Of those millions, only a few thousand accounts were compromised due to credential stuffing.

60.     While 23andMe has, in its December 2023 and January 2024 notices, identified some steps it has taken to improve security by resetting passwords and requiring two-factor authentication, security experts do not think account-centric security is enough. Generally, experts recommend that companies need to combine two factor authentication with robust data-centric security plans to avoid future credential stuffing attacks.  Anomaly and behavior detection are also important if technical controls are to be strengthened. Attackers are finding new and improved ways of hacking, making

---

[16] Jonathan Greig, "23andMe scraping incident leaked data on 1.3 million users of Ashkenazi and Chinese descent" The Record, (Oct. 6, 2023) https://therecord.media/scraping-incident-genetic-testing-site

1  attack traffic look like standard traffic. Advanced behavioral threat protection is needed to fight the
2  growing number of dangerous threats.[17]  To date, 23andMe has provided no monitoring for its
3  customers whose information has been offered for sale on the dark web, a practice which is increasingly
4  common and recommended by the FTC.[18]

5      61.    As Connecticut Attorney General William Tong wrote in a letter to the company,
6  "23andMe is in the business of collecting and analyzing the most sensitive and irreplaceable
7  information about individuals, their genetic code. This incident raises questions about the processes
8  used by 23andMe to obtain consent from users, as well as the measures taken by 23andMe to protect
9  the confidentiality of sensitive personal information."[19]

10     62.    Similarly, U.S. Congressman Josh Gottheimer—a member of the House Permanent
11 Select Committee on Intelligence—wrote to the FBI in a January 11, 2024, expressing "concern[] that
12 the leaked data could empower Hamas, their supporters, and various international extremist groups to
13 target the American Jewish population and their families" and expressed an urgent need "to protect the
14 information, locations, and lives of the American Jewish population."

15     63.    Likewise, Arizona Attorney General Kris Mayes recently sent a letter to 23andMe
16 expressing her concerns for the safety of its Jewish and Chinese customers, noting that "the recent
17 increase in all hate crimes across the country, especially antisemitic and anti-Asian hate crimes, means
18 that this is a particularly dangerous time for the targeted sale of information of individuals identifying
19 and belonging to specific racial or ethnic groups—information that 23andMe profits from analyzing."

20     64.    23andMe said it didn't find any evidence of a "data security incident," a distinction it
21 drew because the information hackers gathered was available to opted-in users. But putting the burden
22 on consumers to protect their own sensitive data with strong passwords and careful management is
23 wrongheaded, said Suzanne Bernstein, a law fellow at digital rights nonprofit Electronic Privacy

24

25     [17] Tech HQ, "Victims of 23andMe data breach blamed for reused passwords" TechHQ (Feb. 1, 2024)
26 https://techhq.com/2024/02/victims-of-23andme-data-breach-blamed-by-company/
       [18] Federal  Trade  Commission  "Data  Breach  Response:  A  Guide  for  Business"  ftc.gov
27 https://www.ftc.gov/business-guidance/resources/data-breach-response-guide-business
       [19] Aaron Katersky, "Connecticut attorney general presses 23andMe for data breach answers" ABC
28 News (Oct. 31, 2023) https://abcnews.go.com/US/connecticut-attorney-general-presses-23andme-data-
   breach-answers/story?id=104510476

1  Information Center.  "If 23andMe is collecting, storing and processing a tremendous amount of very

2  highly sensitive personal data, I think at the end of the day they should take responsibility for that," she

3  said.[20]  23andMe users, particularly those of Ashkenazi and Chinese descent, are in particular danger of

4  discrimination, blackmail, and targeted attacks.

5       65.    Instead of affirmatively protecting its customers and taking responsibility for its

6  website's flawed design and poor security, 23andMe has repeatedly shirked responsibility and blamed

7  customers for their alleged negligence, even though over half its users were exposed to a threat actor

8  from breaches of 0.1% of 23andMe's accounts.  Instead, despite knowledge of advertisements for the

9  sale of the data, 23andMe told the New York Times that it had "not learned of any reports of

10  inappropriate use of the data after the leak."[21]  By maintaining insecure data practices and then failing

11  to inform their customers about the scope and danger of the leak, and further failing to provide their

12  customers with any remedy, 23andMe has repeatedly let down its customers and exposed them to

13  heightened risk for harassment, financial fraud, medical fraud, and identity theft for years to come.

14       66.    As part and parcel of 23andMe's disregard for their customers, before sending notices to

15  the full seven million customers affected, 23andMe first changed its terms and conditions to add

16  arbitration requirements that would prevent customers from pursuing claims against the company, both

17  individually and as a class.  On November 30, 2023, mere days before its December 1 SEC filing and

18  December 5 notice to affected customers, 23andMe updated its terms of service in an effort to make it

19  more difficult for the victims of the data breach to bring class actions or mass arbitrations.  Despite the

20  language in the notice, the changes will not "streamline arbitration proceedings" but instead creates an

21  initial dispute resolution period in which customers have to talk to 23andMe one-on-one before filing

22  an arbitration claim.  Further, 23andMe's updated terms now compel customers to negotiate a dispute

23  for 60 days before filing an arbitration claim.

24  **VII.  23andMe Failed to Implement Basic Security and Threat Detection Measures**

25       67.    Despite its claims that it would safeguard its customers, based on  its subsequent

26

27      [20] Tatum Hunter, "23andme hack: What you can do after the data leak" THE WASHINGTON POST (Oct. 12 2023) https://www.washingtonpost.com/technology/2023/10/12/23andme-hack-data-breach/

28      [21] Rebecca Carballo, "Data Breach at 23andMe Affects 6.9 Million Profiles, Company Says" THE NEW YORK TIMES (Dec. 4, 2023) https://www.nytimes.com/2023/12/04/us/23andme-hack-data.html

blaming of those customers and failure to take any responsibility, it is clear that 23andMe failed to protect its customers and did not implement reasonable and adequate security measures prior to the breach.

68.     The fact that hackers started attacking 23andMe systems in April 2023 and yet 23andMe was not aware of the breach until a second online post publicizing the hacked data in October 2023, shows that 23andMe completely failed to take the proper steps to detect unauthorized access.  The fact that half of 23andMe customers were ultimately affected by a credential stuffing attack, which is commonplace and has a low rate of success, shows that 23andMe failed to anticipate and prevent reasonably foreseeable threats.  The scope of information obtained through the attack from customers whose log-in credentials had not been hacked further shows that 23andMe failed to properly assess the security and privacy risk of its product features.  23andMe failed to follow industry guidance and, despite their representations, did not provide security that "exceed[s] industry data protections."

69.     Credential stuffing has been a common method of hacking for over a decade.[22] Attackers take usernames and passwords from a prior breach and try to "stuff" those credentials into the login page of other services, hoping that the users have reused the same username and password. Credential stuffing though, relies on automation and patience, whereby credential stuffing campaigns try to blend malicious requests into the noise of legitimate logins.  Attackers typically only get 0.1 to 2 percent of matching credentials—in 23andMe's case, the 14,000 accounts accessed through credential stuffing mean that hackers attempted up to 14 million times.  23andMe claimed that it "conduct[s] regular assessments to identify security vulnerabilities and threats."  But if 23andMe had adequate threat detection tools, it would have detected this enormous attack, whether through tracking logins or suspicious account activity, monitoring public data dumps for impacted customer accounts, or implementing advanced detection firewalls that detect and inhibit credential stuffing attacks.[23]

70.     Multi-factor authentication has been the primary countermeasure for credential

---

[22]   Lily Hay Newman, "What Is Credential Stuffing?" WIRED (Feb. 17, 2019) https://www.wired.com/story/what-is-credential-stuffing/
[23]   Lucian Constantin, "Credential stuffing explained: How to prevent, detect, and defend against it" CSO Online (May 27, 2021), https://www.csoonline.com/article/567905/credential-stuffing-explained-how-to-prevent-detect-and-defend-against-it.html

1  stuffing.[24]   In 2020, the SEC's Office of Compliance Inspections and Examinations observed that

2  "properly implemented, MFA can offer one of the best defenses to password-related attacks."

3  23andMe has had optional multi-factor authentication for customers since 2019, placing the burden on

4  customers to be "mindful of keeping your password and other authentication information safe from

5  third parties, and immediately notify 23andMe of any unauthorized use of your login credentials."

6  23andMe should have proactively protected its customers and required multi-factor authentication—as

7  it did belatedly in November 2023, after the breach occurred.  Further, to combat the automated scripts

8  or bots used in credential stuffing attacks, 23andMe could have and should have implemented a

9  Completely Automated Public Turing test to tell Computers and Humans Apart ("CAPTCHA"), an

10  industry standard that requires users to confirm that they are not running automated scripts by

11  performing an action to prove they are human.

12       71.     23andMe further boasted that it "achieved 3 different ISO certifications to demonstrate

13  the strength of our security program."  ISO certifications are information security standards published

14  jointly by the International Organization for Standardization (ISO) and the International

15  Electrotechnical Commission (IEC) for best practices on information security management.  These

16  three ISO certifications were ISO/IEC 27001:2013, 27018, and 27701—all of which, by 2023, when the

17  breach occurred, were outdated.  ISO/IEC 27001:2013, for example, requires the systematic

18  examination of an organization's security risk, the design and implementation of a coherent and

19  comprehensive suite of information security controls, and adoption of an overarching management

20  process to ensure that information security controls meet security needs on an ongoing basis.  23andMe

21  held the certification for the standard in 2013, but the standard was revised again in 2022 to be more

22  comprehensive.  23andMe did not upgrade its certifications, which would have introduced additional

23  controls on threat intelligence, data leakage prevention, and monitoring relevant to this breach.

24  23andMe thus did not meet the prevailing industry standards, and its outdated certifications

25  demonstrated weaknesses, rather than strengths.

26       72.     At no time prior to the breach did 23andMe warn customers of the risks of using the

27

28  ――――――――――――――
    [24]   Neal   Mueller,   "Credential   stuffing"   OWASP   Foundation   https://owasp.org/www-
    community/attacks/Credential_stuffing

DNA Relatives feature.  Under the ISO/IEC standards that 23andMe advertised it achieved, 23andMe should have assessed and knew or should have known that the DNA Relatives feature could compromise the integrity of numerous customer profiles if a single associated account was breached. 23andMe did not impose additional safeguards to mitigate this risk and did not warn customers about this risk.  If customers had known about the privacy and data security risks associated with using that feature, they would have likely opted out.

73.     Finally, 23andMe failed to comply with guidance promulgated by the Federal Trade Commission ("FTC") on adequate data security practices, handling confidential consumer information, and the importance of incident response and breach disclosure.  Regardless of whether a breach notification law applies, a breached entity that fails to timely disclose information to help parties mitigate reasonably foreseeable harm may violate Section 5 of the FTC Act.[25]  23andMe's delay in identifying and reporting the breach prevented customers from promptly mitigating the potential adverse consequences resulting from the breach, including identity theft and loss of sensitive data, and increased their risk of fraudulent use of their information.  "Effective detection and response capabilities are core components of a security program and when they fail, companies should effectively and completely disclose what happened."[26]

74.     23andMe has failed and continues to fail its customers through its insecure systems, delay in notifying customers of the breach, and refusal to take responsibility to mitigate the harms of the breach. 23andMe customers sought its services to learn more about their health and ancestry, reasonably believing that this incredibly sensitive data would be well protected and safeguarded, a point that 23andMe advertised to its users.  Instead, customers have been exposed to danger and fraud— particularly Ashkenazi and Chinese users, whose data has been targeted for sale to terrorists and threat actors—with the potential for devastating consequences as their genetic and ancestry information, among others, have been leaked on the dark web.

---

[25] Team CTO and the Division of Privacy and Identity Protection, "Security Beyond Prevention: The Importance of Effective Breach Disclosures" Federal Trade Commission (ftc.gov) (May 20, 2022) https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2022/05/security-beyond-prevention-importance-effective-breach-disclosures
[26] *Id.*

## CLASS ACTION ALLEGATIONS

75.     Plaintiff brings this action as a class action under Rule 23 of the Federal Rules of Civil Procedure, on behalf of themselves and the following Classes:

**Class Definition:** All persons who have been adversely affected by the data breach announced by Defendant 23andme, Inc. on October 11, 2023 and December 1, 2023, including all persons who were sent notice by Defendant that their personal information was compromised as a result of the data breach.

**Subclass #1 – All Persons of Jewish Heritage and Chinese Ancestry:** All individuals in the Nationwide Class who are identified by their PGI as having  Jewish heritage or Chinese ancestry.[27]

**Subclass #2 –- State Genetic Privacy Statute Subclass**: All individuals in the Nationwide Class who reside in Illinois, Oregon, or Alaska.

75.     Excluded from the Class are any entities, including Defendant, in which Defendant or its subsidiaries or affiliates have a controlling interest, Defendant's officers, agents and employees, the judicial officer to whom this action is assigned and any member of the Court's staff and immediate families, as well as claims for personal injury, wrongful death, and emotional distress.

76.     **Numerosity Under Rule 23(a)(1).** The members of the Class are so numerous that joinder of all members would be impracticable. Based on information and belief, Plaintiff alleges that the Class includes millions of members.

77.     **Commonality and Predominance Under Rule 23(a)(2) and 23(b)(3)**. This action involves common questions of law or fact, which predominate over any questions affecting individual Class members, including:

(a)     whether Defendant shared the personal information of Plaintiff and other Class members with third parties without their authorization or consent;

(b)     whether Defendant violated Plaintiff's and Class members' privacy rights;

---

[27] Plaintiff reserves the right to expand this definition to include any additional ethnic, racial, or otherwise vulnerable populations that were specifically targeted through the breaches.

(c)    whether Defendant intruded upon Plaintiff's and the Class members' seclusion;

(d)    whether Defendant acted negligently;

(e)    whether Plaintiff and other Class members formed implied contracts with Defendant;

(f)    whether Defendant breached implied contracts with Plaintiff and the Class members and breached the implied covenant of good faith and fair dealing;

(g)    whether Defendant violated the CCPA;

(i)    whether Defendant violated the California UCL;

(j)    whether Plaintiff and the Class members were harmed as a result of Defendant's conduct, including increased risk of identity theft and loss of value of personal information;

(k)    whether Plaintiff and the Class members are entitled to actual, statutory, or other forms of damages or any other monetary relief; and

(l)    whether Plaintiff and the Class members are entitled to declaratory and equitable relief.

78.    Plaintiff's claims are typical of the members of the Class as all members of the Class are similarly affected by Defendant's actionable conduct. Defendant's conduct that gave rise to Plaintiff's claims is the same for all members of the Class.

79.    Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff and on behalf of the other Class members. Similar or identical statutory and common-law violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quantity and quality, to the numerous questions that dominate this action.

80.    **Typicality Under Rule 23(a)(3).** Plaintiff's claims are typical of the claims of the other Class members because, among other things, (a) Plaintiff and the other Class members provided personal information to Defendant; and (b) in its uniform misconduct alleged herein, Defendant shared the personal information of Plaintiff and other Class members without their authorization or consent. Plaintiff and other Class members are advancing the same claims that are based on the same legal theories. There are no defenses that are unique to Plaintiff.

1   81.   **Adequacy of Representation Under Rule 23(a)(4).** Plaintiff is an adequate

2   representative of the Class because (a) his interests do not conflict with the interests of the other Class

3   members he seeks to represent; (b) he has retained counsel competent and experienced in complex class

4   action litigation, including data-privacy litigation; (c) he will prosecute this action vigorously; and (d)

5   he has no interests that are contrary to or in conflict with the interests of other Class members.

6   82.   **Superiority Under Rule 23(b)(3).** A class action is superior to other available methods

7   for the fair and efficient adjudication of this controversy because joinder of all the members of the Class

8   is impracticable. Furthermore, the adjudication of this controversy through a class action will avoid the

9   possibility of inconsistent and potentially conflicting adjudication of the asserted claims. There should

10   be no difficulty in managing this action as a class action.

11   83.   Class certification is also appropriate under Rule 23(b)(2) because Defendant has acted

12   or has refused to act on grounds generally applicable to the Class, so that corresponding declaratory

13   relief is appropriate to the Class as a whole.

14   84.   California law applies to the claims asserted in this complaint because:

15   •   Defendant is headquartered in California;

16   •   all Defendant's key decisions and a substantial part of its operations emanate from

17       California;

18   •   a substantial number of the Class members reside in California;

19   •   California has a strong interest in preventing corporations headquartered in the state

20       from engaging in unfair, unlawful, and deceptive business practices; and

21   •   California has a strong interest in providing redress for its citizens for Defendant's

22       illegal conduct.

## CAUSES OF ACTION

## COUNT I

### Violations of the Comprehensive Computer Data Access and Fraud Act Cal. Penal Code § 502

26   85.   Plaintiff realleges and incorporates all previous allegations as though fully set forth

27   herein.

28

86.     The California Legislature enacted the Comprehensive Computer Data Access and Fraud Act, Cal. Penal Code § 502 ("CDAFA") to "expand the degree of protection afforded. . . from tampering, interference, damage, and unauthorized access to (including the extraction of data from) lawfully created computer data and computer systems," finding and declaring that "the proliferation of computer technology has resulted in a concomitant proliferation of . . . forms of unauthorized access to computers, computer systems, and computer data," and that "protection of the integrity of all types and forms of lawfully created computers, computer systems, and computer data is vital to the protection of the privacy of individuals. . . ." CAL. PENAL CODE § 502(a).

87.     Plaintiff's devices on which he accessed his account at 23andme, including his computers, smart phones, and tablets constitute "computers, computer systems, and/or computer networks" within the meaning of the CDAFA.

88.     Defendant violated § 502(c)(1)(B) of the CDAFA by knowingly accessing and without permission accessing Plaintiff's and Class members' devices in order to obtain their personal information, including their device and location data, and in order for Defendant to share that data with third parties, in violation of users' reasonable expectations of privacy in their devices and data.

89.     Defendant violated Cal. Penal Code § 502(c)(2) by knowingly and without permission accessing, taking and using Plaintiff's and the Class Members' personally identifiable information.

90.     The computers and mobile devices that Plaintiff and Class members used to access and service their accounts with 23andme all have and operate "computer services" within the meaning of the CDAFA. Defendant violated §§ 502(c)(3) and (7) of the CDAFA by knowingly and without permission accessing and using those devices and computer services, or causing them to be accessed and used, *inter alia* in connection with Defendant's sharing of information with third parties, and in some cases other users of Defendant's services who were able to access user data.

91.     Defendant violated §§ 502(c)(6) and (c)(13) of the CDAFA by knowingly and without permission providing and/or assisting in providing third parties a means of accessing Plaintiff's and Class members' computers and mobile devices.

92.     Under California Penal Code § 502(b)(12) a "[c]omputer contaminant" is defined as "any set of computer instructions that are designed to ... record, or transmit information within a

1  computer, computer system, or computer network without the intent or permission of the owner of the

2  information."

3      93.    Defendant violated California Penal Code § 502(c)(8) by knowingly and without

4  permission introducing a computer contaminant into the transactions between Plaintiff and the Class

5  Members and websites; including but not limited to the code that intercepted Plaintiff's and the Class

6  Members' private and personal data and transmitted that data to third parties.

7      94.    As a direct and proximate result of Defendant's unlawful conduct within the meaning of

8  California Penal Code § 502, Defendant caused loss to Plaintiff and the Class Members in an amount to

9  be proven at trial, including that Plaintiff and the Class Members were injured by the loss of value of

10  their personal information. Plaintiff and the Class Members are also entitled to recover their reasonable

11  attorneys' fees under California Penal Code § 502(e)(2).

12      95.    Plaintiff and the Class Members seek compensatory damages in accordance with

13  California Penal Code § 502(e)(1), in an amount to be proven at trial, and injunctive or other equitable

14  relief.

15      96.    Plaintiff and Class Members have suffered irreparable and incalculable harm and injuries

16  from Defendant's violations. The harm will continue unless Defendant is enjoined from further

17  violations of this section. Plaintiff and Class Members have no adequate remedy at law.

18      97.    Plaintiff and the Class Members are entitled to punitive or exemplary damages pursuant

19  to Cal. Penal Code § 502(e)(4) because Defendant's violations were willful and, upon information and

20  belief, Defendant is guilty of oppression, fraud, or malice as defined in Cal. Civil Code § 3294.

21      98.    Plaintiff and the Class Members have also suffered irreparable injury from these

22  unauthorized acts of disclosure: their personal, private, and sensitive communications have been

23  harvested, viewed, accessed, stored, and used by Defendant, and have not been destroyed, and due to

24  the continuing threat of such injury, have no adequate remedy at law, entitling Plaintiff and the Class to

25  injunctive relief.

26

27

28

## COUNT II

### Negligence

99.     Plaintiff realleges and incorporates all previous allegations as though fully set forth herein.

100.     Defendant owed a duty to Plaintiff and Class members arising from the sensitivity of Plaintiff's and Class members' information.  23andme assumed a duty to provide its services in a secure and encrypted environment and one free from breaches and attacks by cyber criminals.  23andme owed a duty to Plaintiff and the other Class members to exercise reasonable care in (a) using their PII in compliance with all applicable law and the terms of 23andme's privacy policy; (b) safeguarding their PII in its possession; and (c) ensuring security in 23andme's services.

101.     To fulfill this duty, 23andme was obligated to implement and maintain adequate security measures to protect its users' personal information and to avoid disclosure of its users' personal information to any third parties without their knowledge and consent.

102.     Defendant's duties included, among other things, the duty to design, maintain, implement, monitor, test, and comply with reliable security systems, protocols, and practices to ensure that Plaintiff's and Class members' transactions and PII were adequately secured from unauthorized access, and the duty to maintain the confidentiality of its users' private and personal information, including by refraining from sharing such information with unauthorized parties without users' informed and clear consent.

103.     Defendant breached its duties by, among other things, (1) failing to implement and maintain reasonable security protections and protocols, including by implementing end-to-end encryption, in accordance with its representations, and sufficient security protocols to prevent cyberattacks and ransomware; (2) knowingly sharing and/or selling customers' personal data to third parties for analytics and marketing purposes without adequate disclosure to and consent from its customers; and (3) failing to warn users of the risk of cyberattacks and data breaches.

104.     Plaintiff and the Class members used 23andme's services in reliance on its exercise of due care and fulfillment of its duties.

105.     23andme, however, breached its duties by, among other things:

1      (a)  disclosing Plaintiff's and other Class members' personal information to unauthorized

2         third parties;

3      (b) allowing third parties to access the personal information of Plaintiff and other Class

4         members;

5      (c) failing to implement and maintain adequate security measures to safeguard users'

6         personal information;

7      (d)  failing to timely notify Plaintiff and other Class members of the unlawful disclosure

8         of their personal information; and

9      (e) failing to maintain adequate security and proper encryption in 23andme's websites,

10         customer portals, and other computer systems.

11      106.    Defendant's misconduct is inconsistent with industry regulations and standards.

12      107.    Plaintiff and other Class members did not contribute to  Defendant's misconduct.

13      108.    The harm inflicted upon Plaintiff and other Class members was reasonably foreseeable

14 to Defendant and was proximately caused by Defendant's negligence.

15      109.    As a direct and proximate result of Defendant's negligent conduct, Plaintiff and Class

16 members have suffered injury and are entitled to damages in an amount to be proven at trial.

17                      **COUNT III**

18                     **Negligence *Per Se***

19      110.    Plaintiff realleges and incorporates all previous allegations as though fully set forth

20 herein.

21      111.    Pursuant to the FTC Act (15 U.S.C. § 45), 23andme had a duty to provide adequate data

22 security practices in connection with safeguarding Plaintiff's and Class members' Personal Information.

23      112.    Pursuant to the FTC Act (15 U.S.C. § 45), 23andme had a duty to provide adequate data

24 security practices to safeguard Plaintiff's and Class members' Personal Information.

25      113.    Defendant breached its duties to Plaintiff and Class members under the FTC Act (15

26 U.S.C. § 45), the Gramm-Leach-Bliley Act (15 U.S.C. §§ 6801, *et seq*.), the California Consumer

27 Privacy Act, Cal. Civ. Code §§ 1798.100, *et seq*. ("CCPA"), and Cal. Civ. Code §§ 1798.80, *et seq*.,

28

1  among other statutes, by failing to provide fair, reasonable, or adequate data security in connection with
2  the sale of services in order to safeguard Plaintiff's and Class members' Personal Information.

3       114.    Defendant's failure to comply with applicable laws and regulations constitutes
4  negligence *per se*.

5       115.    But for Defendant's wrongful and negligent breach of duties owed to Plaintiff and Class
6  members, Plaintiff and Class members would not have been injured.

7       116.    The injury and harm suffered by Plaintiff and Class members was the reasonably
8  foreseeable result of Defendant's breach of duties. Defendant knew or should have known that it was
9  failing to meet its duties, and that a breach would cause Plaintiff and Class members to experience the
10  foreseeable harms associated with the exposure of their Personal Information.

11       117.    As a direct and proximate result of Defendant's negligence *per se*, Plaintiff and Class
12  members have been harmed and face an imminent and ongoing risk of harm.

13       118.    As a direct and proximate result of Defendant's negligence *per se*, Plaintiff and Class
14  members have suffered injury and are entitled to damages in an amount to be proven at trial.

15  **<u>COUNT IV</u>**
16  **<u>Breach Of Contract</u>**

17       119.    Plaintiff realleges and incorporates all previous allegations as though fully set forth
18  herein.

19       120.    Plaintiff and Class members entered into contracts with 23andme with respect to the
20  services provided by Defendant.

21       121.    23andme's Privacy Policy is a part of such contracts.

22       122.    Defendant's Privacy Policy stated that:

23    "Your privacy comes first.  When you explore your DNA with 23andMe, you entrust us with
24  important personal information. That's why, since day one, protecting your privacy has been our
25  number one priority. We're committed to providing you with a safe place where you can learn about
26  your DNA knowing your privacy is protected."

27
28

123.    The specific protections that 23andme represented to Plaintiff that it had adopted and implemented, and that it agreed to utilize as part of providing services to Plaintiff, included its representation that:

- We will not share your genetic data with employers, insurance companies, public databases or 3rd party marketers without your explicit consent.
- We give you full control to decide how your information is used and with whom it is shared.
- We break everything down into easy-to-understand language so that each choice you make is an informed choice.
- We exceed industry data protection standards and have achieved 3 different ISO certifications to demonstrate the strength of our security program.
- We encrypt all sensitive information and conduct regular assessments to identify security vulnerabilities and threats.
- We will not release any individual-level personal information to law enforcement unless we are required to do so by court order, subpoena, search warrant or other requests that we determine are legally valid.

124.    Plaintiff and Class members performed all their obligations under the contracts.

125.    Defendant breached its obligations under the contracts, including by failing to provide adequate privacy, security, and confidentiality safeguards for Plaintiff and Class members' PII.

126.    As a direct and proximate result of Defendant's breach of contract, Plaintiff and Class members did not receive the full benefit of the bargain, and instead received services that were less valuable than described in the contracts and which subjected Plaintiff and the Class to a significant risk of a cyberattack and data breach.

127.    Plaintiff and Class members have suffered actual damages resulting from the exposure of their PII, and they remain at imminent risk of suffering additional damages in the future. Accordingly, Plaintiff and Class members are entitled to damages and/or restitution in an amount to be proven at trial.

## COUNT VI

### Breach of Implied Contract

128.    Plaintiff realleges and incorporates all previous allegations as though fully set forth herein.

129.    Defendant provided or provides DNA testing and genetic services to Plaintiff and Class members, or Plaintiff and Class members provided their Personal Information to 23andme as prospective customers or in some other capacity.

130.    In connection with their business relationship, Plaintiff and Class members entered into implied contracts with 23andme.

131.    Pursuant to these implied contracts, Plaintiff and Class members provided 23andme with their Personal Information. In exchange, 23andme agreed, among other things: (1) to take reasonable measures to protect the security and confidentiality of Plaintiff's and Class members' Personal Information; and (2) to protect Plaintiff's and Class members' Personal Information in compliance with federal and state laws and regulations and industry standards.

132.    The protection of Personal Information was a material term of the implied contracts between Plaintiff and Class members, on the one hand, and 23andme, on the other hand. Had Plaintiff and Class members known that 23andme would not adequately protect its customers' Personal Information they would not have done business with 23andme.

133.    Plaintiff and Class members performed their obligations under the implied contract when they provided 23andme with their Personal Information.

134.    Necessarily implicit in the agreements between Plaintiff/Class members and 23andme was 23andme's obligation to take reasonable steps to secure and safeguard Plaintiff's and Class members' Personal Information.

135.    Defendant breached its obligations under its implied contracts with Plaintiff and Class members by failing to implement and maintain reasonable security measures to protect their Personal Information.

136.    Defendant's breach of its obligations of its implied contracts with Plaintiff and Class members directly resulted in the Data Breach.

137.    The damages sustained by Plaintiff and Class members as described above were the direct and proximate result of Defendant's material breaches of its agreements.

138.    Plaintiff and other Class members were damaged by 23andme's breach of implied contracts because: (i) they have suffered actual harm or identity theft; (ii) they face a substantially increased risk of identity theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (iii) their Personal Information was improperly disclosed to unauthorized individuals; (iv) the confidentiality of their Personal Information has been breached; (v) they were deprived of the value of their Personal Information, for which there is a well-established national and international market; (vi) they were deprived of the benefit of their bargain; and/or (vii) they lost time and money incurred to mitigate and remediate the effects of the breach, including the increased risks of identity theft they face and will continue to face.

## COUNT V

### Breach of Implied Covenant of Good Faith and Fair Dealing

139.    Plaintiff realleges and incorporates all previous allegations as though fully set forth herein.

140.    There is a covenant of good faith and fair dealing implied in every implied contract. This implied covenant requires each contracting party to refrain from doing anything to injure the right of the other to receive the benefits of the agreement. To fulfill its covenant, a party must give at least as much consideration to the interests of the other party as it gives to its own interests.

141.    Under the implied covenant of good faith and fair dealing,  Defendant is obligated to, at a minimum, (a) implement proper procedures to safeguard the personal information of Plaintiff and other Class members; (b) refrain from disclosing, without authorization or consent, the personal information of Plaintiff and other Class members to any third parties; (c) promptly and accurately notify Plaintiff and other Class members of any unauthorized disclosure of, access to, and use of their personal information; and (d) maintain adequate security and proper encryption in 23andme's websites, customer portals, and services.

142.    Defendant breached the implied covenant of good faith and fair dealing by, among other things:

• disclosing Plaintiff's and other Class members' personal information to unauthorized third parties;

• allowing third parties to access the personal information of Plaintiff and other Class members;

• failing to implement and maintain adequate security measures to safeguard users' personal information;

• failing to timely notify Plaintiff and other Class members of the unlawful disclosure of their personal information; and

• failing to maintain adequate security and proper encryption in Defendant's websites, customer portals, and services.

143.    As a direct and proximate result of Defendant's breaches of the implied covenant of good faith and fair dealing, Plaintiff and other Class members have suffered actual losses and damages.

## COUNT VI

## Breach of Fiduciary Duty

144.    Plaintiff realleges and incorporates all previous allegations as though fully set forth herein.

145.    Defendant owed and owes Plaintiff and the Class a fiduciary duty.  A relationship exists between Plaintiff and Class members and Defendant in which Plaintiff and Class members put their trust in Defendant to protect the Personal Information of Plaintiff and Class members and Defendant accepted that trust.

146.    Defendant breached the fiduciary duties it owed/owes to Plaintiff and Class members by failing to act with the utmost good faith, fairness, and honesty, failing to act with the highest and finest loyalty, and failing to protect the Personal Information of Plaintiff and Class members.

147.    Defendant's breach of fiduciary duty was a proximate cause of damage to Plaintiff and Class members.

148.    But for Defendant's breach of fiduciary duty, Plaintiff and Class members would not have suffered injury and damage.

### COUNT VII

### Violations of The California Customer Records Act

### CAL. CIV. CODE §§ 1798.80, *et seq.*

149.    Plaintiff realleges and incorporates all previous allegations as though fully set forth herein.

150.    The California Customer Records Act requires that any business that "owns, licenses, or maintains personal information about a California resident shall implement and maintain reasonable security procedures and practices appropriate to the nature of the information, to protect the personal information from unauthorized access, destruction, use, modification, or disclosure." CAL. CIV. CODE § 1798.81.5.

151.    Defendant is subject to the California Customer Records Act because it owns, maintains, and licenses personal information, within the meaning of Section 1798.81.5, about Plaintiff and the Class.

152.    Defendant violated Civil Code § 1798.81.5 by failing to adopt and utilize reasonable measures to protect Plaintiff's personal information.

153.    As a direct and proximate result of Defendant's violations of Section 1798.81.5 of the California Civil Code, the Data Breach described above occurred.

154.    Plaintiff suffered damages and injury including, but not limited to, time and expenses related to monitoring his financial accounts for fraudulent activity, attorneys' fees and expenses in bringing suit to seek redress against Defendant, an increased, imminent risk of fraud and identity theft, and loss of value of his personally identifying information.

155.    Plaintiff seeks relief under section 1798.84 of the California Civil Code including, but not limited to, actual damages, to be proven at trial, and injunctive relief.

**COUNT VIII**

**Violations of The California Unfair Competition Law**

**CAL. BUS. & PROF. CODE §§ 17200, *et seq.***

156.    Plaintiff realleges and incorporates all previous allegations as though fully set forth herein.

157.    California's Unfair Competition Law ("UCL") prohibits any "unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." CAL. BUS. & PROF. CODE § 17200.

158.    Defendant engaged in unfair, fraudulent, and unlawful business practices in connection with its provision of services to Plaintiff and the Class, in violation of the UCL.

159.    As alleged herein, Defendant expressly represented to consumers such as Plaintiff and Class members, among other things: that 23andme had a strong Privacy Policy, that it took extensive and concerted efforts to safeguard Plaintiff's sensitive financial and personal information, that Plaintiff's transactions with 23andme were secure, including by use of end-to-end encryption; and that Defendant would maintain adequate security practices and procedures to protect Plaintiff's and Class members' private information from unauthorized access. Defendant also omitted or concealed the material fact that its privacy and security measures were inadequate, and thus failed to disclose to Plaintiff and Class members that it failed to meet legal and industry standards for the protection of its customers' private property and information. Defendant also concealed its commercial tracking and sharing of customers' personal data with third parties.

160.    The acts, omissions, and conduct of Defendant as alleged herein constitute "business practices" within the meaning of the UCL.

161.    Defendant violated the "unlawful" prong of the UCL by violating, *inter alia*, Plaintiff's and Class members' constitutional rights to privacy, state and federal privacy statutes, and state consumer protection statutes, such as the CCPA, CCRA, and FTC Act as alleged herein.

162.    Defendant 23andme violated the unlawful prong of the UCL by failing to honor the terms of its implied contracts with Plaintiff and Class members in California, as alleged herein.

163.     Defendant 23andme violated the unlawful prong of the UCL by failing to honor the terms of its implied contracts with Plaintiff and Class members in California, as alleged herein. Defendant's conduct also undermines California public policy — as reflected in statutes like the California Information Practices Act, Cal. Civ. Code §§ 1798, *et seq*., the CCPA concerning consumer privacy, and the CCRA concerning customer records — which seek to protect customer and consumer data and ensure that entities who solicit or are entrusted with personal data utilize reasonable security measures.

164.     Defendant's acts, omissions, and conduct also violate the unfair prong of the UCL because Defendant's acts, omissions, and conduct also offended public policy (including federal privacy statutes, and state consumer protection statutes, such as CalOPPA, CDAFA, and HIPAA) and constitute immoral, unethical, oppressive, and unscrupulous activities that caused substantial injury, including to Plaintiff and Class members.

165.     The harm caused by Defendant's conduct outweighs any potential benefits attributable to such conduct and there were reasonably available alternatives to further Defendant's legitimate business interests, other than Defendant's conduct described herein.

166.     By exposing, compromising, and willfully sharing and/or selling Plaintiff's and Class members' private property and personal information without authorization, Defendant engaged in a fraudulent business practice that is likely to deceive a reasonable consumer. Defendant's failure to utilize, and to disclose that they do not utilize, industry standard security practices, constitutes an unfair business practice under the UCL. Defendant's conduct is unethical, unscrupulous, and substantially injurious to the Class. While Defendant's competitors have spent the time and money necessary to appropriately safeguard their products, service, and customer information, Defendant has not—to the detriment of its customers and to competition.

167.     A reasonable person would not have agreed to purchase and/or use 23andme's services had he or she known the truth about Defendant's practices alleged herein. By withholding material information about its practices, Defendant was able to convince customers to use its services and to entrust their highly personal information to Defendant. Accordingly, Defendant's conduct also was "fraudulent" within the meaning of the UCL.

168.    As a result of Defendant's violations of the UCL, Plaintiff and Class members are entitled to injunctive relief.

169.    As a result of Defendant's violations of the UCL, Plaintiff and Class members have suffered injury in fact and lost money or property, including but not limited to payments to Defendant and/or other valuable consideration, *e.g.* access to their private and personal data. The unauthorized access to Plaintiff's and Class members' private and personal data also has diminished the value of that information.

170.    Defendant's conduct also violated the "fraudulent" prong of the UCL.  By failing to disclose that it does not enlist industry standard security practices, all of which rendered Class members vulnerable to data breaches, Defendant 23andme engaged in UCL-violative practices.

171.    A reasonable consumer would not have utilized 23andme's DNA and genetic testing services had they known the truth about its deficient security procedures. By concealing material information about its security practices, 23andme was able to obtain customers who provided and entrusted their Personal Information in connection with transacting business with 23andme.

172.    As a result of Defendant's violations of the UCL, Plaintiff and Class members have suffered injury in fact and lost money or property, as detailed herein.

173.    In the alternative to those claims seeking remedies at law, Plaintiff and the Class allege that there is no plain, adequate, and complete remedy that exists at law to address Defendant's unlawful, unfair, and fraudulent practices. Therefore, Plaintiff and members of the proposed Class are entitled to equitable relief to restore Plaintiff and Class members to the position they would have been in had Defendant not engaged in unfair competition, including an order enjoining Defendant's wrongful conduct, restitution, and disgorgement of all profits paid to Defendant as a result of its unfair, deceptive, and fraudulent practices.

## COUNT IX

### Invasion of Privacy Violation of California Common Law and

### The California Constitution, Art. 1, § 1

174.    Plaintiff realleges and incorporates all previous allegations as though fully set forth herein.

175.    Plaintiff and Class members have a legally protected privacy interest in their private and personal information that is transferred to or utilized by 23andme, and are entitled to the protection of their property and information against unauthorized access.

176.    Plaintiff and Class members reasonably expected that their personal data would be protected and secure from unauthorized parties, and that their private and personal information would not be disclosed to any unauthorized parties or disclosed for any improper purpose.

177.    Defendant unlawfully invaded the privacy rights of Plaintiff and Class members by failing to keep Plaintiff's and Class members' PII safe, knowingly employing inadequate data privacy policies and protocols, and disclosing PII.  By doing so, Defendant unlawfully invaded Plaintiff's and Class members' privacy by, *inter alia*: (a) intruding into Plaintiff's and Class members' private affairs in a manner that would be highly offensive to a reasonable person; (b) invading Plaintiff's and Class members' privacy by improperly using their Personal Information properly obtained for a specific purpose for another purpose, or disclosing it to some third party; (c) failing to adequately secure PII from disclosure to unauthorized persons; and (d) enabling the disclosure of Plaintiff's and Class members' Personal Information without consent.

178.    In failing to adequately secure Plaintiff's and Class members' personal information, Defendant acted in reckless disregard of their privacy rights. Defendant knew or should have known that its substandard security measures would cause its users harm and would be considered highly offensive to a reasonable person in the same position as Plaintiff and Class members.

179.    Defendant violated Plaintiff's and Class members' right to privacy under California law, including, but not limited to California common law and Article 1, Section 1 of the California Constitution and the California Consumer Privacy Act.

180.    As a direct and proximate result of Defendant's unlawful invasions of privacy, Plaintiff's and Class members' private, personal, and confidential information has been accessed or is at imminent risk of being accessed, and their reasonable expectations of privacy have been intruded upon and frustrated. Plaintiff and proposed Class members have suffered injuries as a result of Defendant's unlawful invasions of privacy and are entitled to appropriate relief.

181.     Plaintiff and Class members are entitled to injunctive relief as well as actual and punitive damages.

### COUNT X

### Unjust Enrichment

182.     Plaintiff realleges and incorporates all previous allegations as though fully set forth herein.

183.     23andme received Personal Information, money, and fees from Plaintiff and Class members, from which it has profited and benefited.

184.     Defendant has voluntarily accepted and retained these profits and benefits with full knowledge and awareness that, as a result of the misconduct and omissions described herein, Plaintiff and Class members did not receive services of the quality, nature, fitness, or value represented by 23andme and that reasonable consumers expected.

185.     Defendant has been unjustly enriched by its withholding of and retention of these benefits, at the expense of Plaintiff and Class members.

186.     Equity and justice militate against permitting Defendant to retain these profits and benefits.

187.     Plaintiff and Class members suffered injury as a direct and proximate result of 23andme's unjust enrichment and seek an order directing 23andme to disgorge these benefits and pay restitution to Plaintiff and Class members.

### COUNT XI

### Declaratory and Injunctive Relief

188.     Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

189.     Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as those alleged herein, which are tortious, and which violate the terms of the federal and state statutes described above.

190.     An actual controversy has arisen in the wake of the Data Breach at issue regarding Defendant's common law and other duties to act reasonably with respect to safeguarding the data of Plaintiff and the Class. Plaintiff alleges Defendant's actions in this respect were inadequate and unreasonable and, upon information and belief, remain inadequate and unreasonable. Additionally, Plaintiff and the Class continue to suffer injury due to the continued and ongoing threat of additional fraud against them or on their accounts.

191.     Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a. Defendant owed, and continues to owe a legal duty to secure the sensitive personal information with which it is entrusted, specifically including information obtained from its customers, and to notify impacted individuals of the Data Breach under the common law, Section 5 of the FTC Act;

b. Defendant breached, and continues to breach, its legal duty by failing to employ reasonable measures to secure its customers' personal information; and,

c. Defendant's breach of its legal duty continues to cause harm to Plaintiff and the Class.

192.     The Court should also issue corresponding injunctive relief requiring Defendant to employ adequate security protocols consistent with industry standards to protect its users' Personal Information.

193.     If an injunction is not issued, Plaintiff and the Class will suffer irreparable injury and lack an adequate legal remedy in the event of another breach of Defendant's data systems. If another breach of Defendant's data systems occurs, Plaintiff and the Class will not have an adequate remedy at law because many of the resulting injuries are not readily quantified in full and they will be forced to bring multiple lawsuits to rectify the same conduct. Simply put, monetary damages, while warranted to compensate Plaintiff and the Class for their out-of-pocket and other damages that are legally quantifiable and provable, do not cover the full extent of injuries suffered by Plaintiff and the Class, which include monetary damages that are not legally quantifiable or provable and exceeds the hardship to Defendant if an injunction is issued.

194.    Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach, thus eliminating the injuries that would result to Plaintiff, the Class, and the public at large.

### COUNT XII

### Deceit By Concealment, CAL. CIV. CODE § 1710(3)

195.    Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

196.    As detailed above, 23andme failed to disclose and actively concealed information about flaws that undermined the security and privacy of 23andme's customer portal, website, and other systems, including with respect to encryption levels. As 23andme knew, its knowledge was exclusive to the Company and was not generally known to the public or to Plaintiff and other 23andme users, and 23andme had a duty to disclose those facts to Plaintiff and Class members.

197.    Defendant knew that the privacy and security of its services was materially worse than it represented and what Plaintiff and Class members reasonably expected, and intentionally concealed or suppressed those facts with intent to defraud Plaintiff and Class members. Defendant  misrepresented that its systems were secure and that it maintained cutting-edge, industry-standard data encryption and security, while at the same time concealing material information about the deficiencies of its systems.

198.    The information 23andme concealed was material in that it was important to reasonable persons, and Plaintiff and Class members would not have acted as they did if they had known of the concealed or suppressed fact. As a result, Plaintiff and Class members who purchased 23andme products would not otherwise have purchased such services and products.  Furthermore, had Plaintiff known of the inadequate privacy and security of 23andme's systems, Plaintiff and the Class would have taken steps to protect themselves and/or their personal information.

199.    Plaintiff seeks an award of all available damages, including compensatory and punitive damages.

**COUNT XIII**

**Violations of California Consumers Legal Remedies Act**

**CAL. CIV. CODE § 1750, *et seq*.**

200.    Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

201.    This cause of action is brought pursuant to the California Consumers Legal Remedies Act (the "CLRA"), California Civil Code § 1750, *et seq*. This cause of action does not seek monetary damages at this time but is limited solely to injunctive relief. Plaintiff will amend this Complaint later to seek damages in accordance with the CLRA after providing Defendant with notice as required by California Civil Code § 1782.

202.    Plaintiff and Class Members are "consumer[s]," as the term is defined by California Civil Code § 1761(d).

203.    Plaintiff, Class members, and 23andme have engaged in "transaction[s]," as that term is defined by California Civil Code § 1761(e).

204.    Defendant 23andme's acts and omissions, as alleged herein, constitute unfair methods of competition and unfair and deceptive acts and practices for the purpose of the CLRA.

205.    23andme undertook its conduct in a manner that it knew was likely to deceive consumers.

206.    23andme violated the CLRA by "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have."  CAL. CIV. CODE § 1770(a)(5).  23andme did so, as alleged herein, by representing that its systems were secure and that it maintained cutting-edge, industry-standard data encryption and security. It also represented through its Privacy Policy that it had adopted and implemented appropriate measures to protect Plaintiff's and the Class members' Personal Information.

207.    Defendant 23andme also violated the CLRA by improperly handling, storing, and/or protecting either unencrypted or partially encrypted data.

208.    As a result of engaging in such conduct, Defendant has violated the CLRA.

209.    Pursuant to Civil Code § 1780(a)(2) and (a)(5), Plaintiff seeks an order enjoining Defendant from continuing to engage in unlawful, unfair, or fraudulent business practices or any other act prohibited by law.

210.    Plaintiff and the Class suffered injuries caused by Defendant's misrepresentations, because they provided their Personal Information to 23andme believing that 23andme would adequately protect this information.

211.    23andme's unfair and deceptive acts and practices pose a threat of irreparable harm to Plaintiff and the Class.

## COUNT XIV

### Violation of the Illinois, Alaska, and Oregon Privacy Statutes

### (On Behalf of Plaintiff and the State Genetic Privacy Statute Subclass)

212.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.  Plaintiff brings this claim on behalf of himself and the State Genetic Privacy Statute Subclass, as the genetic privacy statutes in Illinois, Alaska, and Oregon are substantially similar in that all three (i) contain private rights of action, (ii) broadly cover genetic information and information derived from genetic information, and (iii) provide for statutory damages.

213.    In enacting the Genetic Information Privacy Act ("GIPA"), the Illinois Legislature recognized that "[t]he public health will be served by facilitating voluntary and confidential nondiscriminatory use of genetic testing information." 410 ILCS 513/5(3); see also Alaska Stat. § 18.13.010, et seq.; Or. Rev. Stat. § 192.533.

214.    GIPA mandates that no person may disclose the identity of any person upon whom a genetic test is performed or the results of a genetic test in a manner that permits identification of the subject of the test. See 410 ILCS 513/30(a); Alaska Stat. § 18.13.010; Or. Rev. Stat. §§ 192.537, 192.539.

215.    Defendant is a corporation and, thus, a "person" under 410 ILCS 513/10; *see also* Alaska Stat. § 18.13.020; Or. Rev. Stat. § 192.531.

216.    Plaintiff and the State Genetic Privacy Statute Subclass members provided their genetic information to Defendant and therefore provided Defendant with "genetic test[s]" and/or the

"information derived from genetic testing" within the meaning of the GIPA. See also Alaska Stat. § 18.13.100; Or. Rev. Stat. § 192.531.

217.    As explained above, Defendant disclosed Plaintiff's and the State Genetic Privacy Statute Subclass members' genetic testing and information derived from genetic testing by failing to enact or enforce adequate data security measures and policies, resulting in the data breach. See 410 ILCS 513/30; Alaska Stat. § 18.13.010; Or. Rev. Stat. § 192.537.

218.    Defendant disclosed Plaintiff's and the State Genetic Privacy Statute Subclass members identifying information to unknown third parties by allowing them to access their genetic information and genetic tests, in addition to personally identifying information.

219.    GIPA plainly prohibits such disclosures because they contain, among other things, the results of Plaintiff's and the State Genetic Privacy State Subclass' genetic tests, including in a manner that permits identification of the subject of the test. See 410 ILCS 513/15 and 30; Alaska Stat. § 18.13.010; Or. Rev. Stat. §§ 192.537, 192.539.

220.    Defendant did not obtain any authorization—including written authorization—from Plaintiff or the State Genetic Privacy Statute Subclass members before disclosing their genetic test results and information derived from genetic testing, as mandated by 410 ILCS 513/30(a)(2); Alaska Stat. § 18.13.010; Or. Rev. Stat. §§ 192.537, 192.539.

221.    By disclosing the results of their genetic tests and information sufficient to identify Plaintiff and the State Genetic Privacy Statute Subclass members as described herein, Defendant violated Plaintiff's and the State Genetic Privacy Statute Subclass's statutorily protected rights to privacy in their genetic information under their respective state's genetic privacy statutes.

222.    On behalf of himself and the State Genetic Privacy Statute Subclass, Plaintiff seeks: (1) injunctive and equitable relief as is necessary to protect the interests of himself and the State Genetic Privacy Statute Subclass members by requiring Defendant comply with the state genetic privacy statutes at issue; (2) liquidated damages or actual damages, whichever is greater, as provided by the state genetic privacy statutes at issue; and (3) costs and reasonable attorneys' fees pursuant to the state genetic privacy statutes at issue. 410 ILCS 513/40(a)(3); Alaska Stat. § 18.13.020; Or. Rev. Stat. § 192.541.

1
## **PRAYER FOR RELIEF**

2      Plaintiff, individually and on behalf of the Class, by and through undersigned counsel,

3   respectfully requests that the Court grant the following relief:

4      A.      Certify this case as a class action pursuant to Fed. R. Civ. P. 23, and appoint Plaintiff as

5   class representative and Plaintiff's counsel as class counsel;

6      B.      Award declaratory and injunctive relief as permitted by law or equity to assure that Class

7   members have an effective remedy, including enjoining Defendant from continuing the unlawful

8   practices as set forth above;

9      C.      Award compensatory, statutory, and punitive damages to Plaintiff and members of the

10  Class to the maximum extent allowable under the law;

11     D.      Award Plaintiff and Class members pre-judgment and post-judgment interest;

12     E.      Award Plaintiff and Class members reasonable attorneys' fees, costs, and expenses; and

13     F.      Award Plaintiff and Class members such other relief as is just and reasonable.

14
## **JURY TRIAL DEMAND**

15     Plaintiff hereby demands a trial by jury on all issues so triable.

16  Dated:  March 8, 2024                        Respectfully submitted,
                                                COTCHETT, PITRE & MCCARTHY, LLP
17

18                                                    */s/ Gia Jung*
                                                     GIA JUNG
19
                                                Gia Jung (SBN 340160)
20                                              Joseph W. Cotchett (SBN 36324)
                                                Mark C. Molumphy (SBN 168009)
21                                              Tyson C. Redenbarger (SBN 294424)
                                                840 Malcolm Road, Suite 200
22                                              Burlingame, California 94010
                                                Telephone:   (650) 697-6000
23                                              Email:      *gjung@cpmlegal.com*
24                                                          *jcotchett@cpmlegal.com*
                                                            *mmolumphy@cpmlegal.com*
25                                                          *tredenbarger@cpmlegal.com*

26                                              BOTTINI & BOTTINI, INC.

27                                                    */s/ Francis A. Bottini, Jr.*
                                                     FRANCIS A. BOTTINI, JR.
28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Francis A. Bottini, Jr. (SBN 175783)
Anne B. Beste (SBN 326881)
Albert Y. Chang (SBN 296065)
7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone:  (858) 914-2001
Email:          *fbottini@bottinilaw.com*
                    *abeste@bottinilaw.com*
                    *achang@bottinilaw.com*

*Counsel for Plaintiff Rudy K. Thompson*

1

**ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(i)(3)**

2   I, Gia Jung, attest that concurrence in the filing of this document has been obtained from the

3 other signatories.  I declare under penalty of perjury under the laws of the United States of America that

4 the foregoing is true and correct.

5     Executed this 8th day of March 2024, at Burlingame, California.

6

7         By  */s/ Gia Jung*

8           Gia Jung

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28